### SANCHEZ et al. v. BOWERS.
### No. 125.

Circuit Court of Appeals, Second Circuit.
May 7, 1934.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen. (Martin Conboy, U. S. Atty., of New York City, of counsel), for appellant.

Taylor, Blanc, Capron & Marsh, of New York City (Charles Angulo and Benjamin Nassau, both of New York City, of counsel), for appellees.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

### L. HAND, Circuit Judge.

The plaintiff is the widow and executrix of one, Frederico Sanchez, who died in 1921, a citizen of Cuba there domiciled. At his death he held in the city of New York a large amount of personal property, consisting of deposits in banks, corporate bonds and shares, and a life insurance policy; he also had real and personal property in Cuba. All of the New York assets stood in his name; he had pledged some of them with a New York bank for a loan of his own, and he held others on "margin" with his brokers. The Cuban law, derived from the Spanish, did not vest the assets in Sanchez, a married man, but in a "sociedad de gananciales"—literally an association for profits—composed of himself and his wife. The underlying purpose of such associations is that the spouses may each contribute to a common stock, the wife her dowry, the husband his "capital," and that the gains from these, as well as from their joint labors, shall be shared equally. The husband has the entire management of the property; he may incur such debts as he pleases and they will charge the assets; in some undefined cases, not here important, apparently the wife may do the same. Debts incurred before marriage are not chargeable directly against the assets, though the interest on certain of them is payable out of them; so are some kinds of repairs and the support and education of the children. The husband may convey the property, give it "moderately" to charity, and use it to set up the children in business or a profession. On dissolution of the association, ordinarily by death, the distribution is as follows: First, the wife gets back her dowry and "parapherna"; next, the debts of the "sociedad" are paid; then the husband's contribution, "capital." What remains is the profits, "gananciales," and is divided equally between the spouses after restoring any losses to their contributed property.

On the testimony in this record we must hold that a "sociedad de gananciales" is a new juristic person in the Cuban law, not only during the marriage, but for purposes of liquidation. The rights of the spouses are claims against this "entity," which holds "title" to all the property. Acting on this hy-

pothesis, the position of the plaintiff is that the only property of Sanchez on his death was a claim—"chose in action"—against the "sociedad" the devolution of which could not be taxed because the association was not domiciled here, and because its mere possession of property in the United States did not subject a claim against it to our jurisdiction. The tax was as little leviable as one upon the devolution of a share of stock in a Cuban corporation which owned American property. The Commissioner declined to accept this view, or indeed to recognize the "sociedad" for any purpose. He appraised the local assets, divided them in half, deducted 10% of this amount as allowance for any local debts, and used the remainder as his base for assessing the tax. The judge accepted the view of the plaintiff except as to one item, the life insurance policy, which he thought to be separate property of Sanchez. The defendant alone appealed.

■ Burnet v. Brooks, 288 U. S. 378, 53 S. Ct. 457, 77 L. Ed. 844, 86 A. L. R. 747, decided that Congress had power to tax the devolution of a bond of or share in an American company when the holder was an alien; it went further and held that the mere presence here of bonds or share certificates in foreign corporations, brought the choses in action themselves within the jurisdiction of the United States. Nothing in the decision suggests that the devolution of a share in a foreign corporation is taxable, merely because the corporation has property in the United States, and the defendant does not so maintain. Nevertheless, even though we assume that a "sociedad de gananciales" is a completely new and separate juristic person, the sole owner of all property acquired after marriage, as all this property was, it does not necessarily follow that the estate of a deceased spouse may not be taxed for any part of its assets. True, in ascertaining whether an association claiming to be an "entity" shall be recognized as such, a court of the forum will look to the state which created it; and so far as it was important here whether the "sociedad" is an "entity," we should have to see what the law of Cuba said about it. But the conditions upon the creation of an excise are only the power to lay one and an expressed intent. As for power, the property was here, and though the title were in the "sociedad," any event which had a substantial legal result upon Sanchez's interests in it would serve. The only question is whether his death was such an event, and it must be owned that it would probably not have been, if the "sociedad" persisted thereafter without substantial change,

if it had been like an ordinary business corporation to whose activities the death of its shareholders is indifferent. But that was not the case; death necessarily terminated the "sociedad," however much of an "entity" it had been. It might still keep a shadowy existence during liquidation, but that was merely of practical necessity; in fact its assets thereupon became ripe for distribution and must be distributed as soon as was conveniently possible. The legal change between the interest of the husband before and after dissolution therefore seems to us to be basis enough to levy an excise; the question is whether the conditions are fulfilled which Congress imposed (section 402 (a) of the Revenue Act of 1918, 40 Stat. 1097). Those were three: The property must be (1) subject to charges against the decedent's estate, (2) to the expenses of its administration, (3) to distribution as part of his estate.

■ There can be no question about the first. All debts contracted by Sanchez after his marriage were by the law of Cuba payable out of the assets, themselves all post-marital. To be sure debts contracted before his marriage were not chargeable except late in an established order of priority, but even these had a place in the hierarchy. Besides, as the couple had been married over thirty years the possibility of pre-marital debts was too remote to count. We think that they were also subject to the expenses of local administration in New York. Under the New York Surrogate's Court Law the surrogate has jurisdiction in all cases where an alien, dying outside the state, leaves personal property within it (section 45, subd. 3; § 46), and of this property, if there is a will, any creditor may secure administration (section 139). If the will has been admitted to probate or "established" elsewhere, ancillary letters must be granted on the application of the person entitled to them (sections 159, 160), who is in the first instance the foreign representative or his appointee, but may be a creditor (sections 161, 133). In such ancillary administration the court may direct the payment of local debts (section 165), and will ordinarily, though not always, (In re Hughes, 95 N. Y. 55), remit the balance to the domiciliary forum for distribution (section 164). A local creditor was not, as we have said, confined to Sanchez's dividend upon the accounting; as to him the assets of the "sociedad" were Sanchez's assets and after his death there was no one against whom he could proceed, though it is true that he might attach. While the case has not apparently come up, it seems to us that in such circum-

stances Sanchez would be regarded as the owner at least so far as to allow a local creditor to take out administration of the American assets to secure payment of American debts. If so, the second condition is fulfilled. Finally, Sanchez certainly had some interest in the assets as eventual distributee; there had indeed to be an accounting, but at the end of it his executor would recover as a liquidating dividend, both his "capital" and his share of the "gananciales." True, in marshalling the American assets after their transmission, the liquidating representative might in fact use them to pay all claims but those of Sanchez. If so, his dividend would be paid out of Cuban assets, and it might be argued that therefore no interest in the American assets was subject to distribution as part of his estate. But such a deliberate choice could be actuated only by a desire to avoid taxation, and can be disregarded in computing taxes. In re Ramsdill's Estate, 190 N. Y. 492, 83 N. E. 584, 18 L. R. A. (N. S.) 946; Kingsbury v. Chapin, 196 Mass. 533, 538, 82 N. E. 700, 13 Ann. Cas. 738; Tilford v. Dickinson, 79 N. J. Law, 302, 75 A. 574; cf. In re Sanford's Estate, 188 Iowa, 833, 175 N. W. 506; Central Union Trust Co. v. State, 110 Kan. 153, 202 P. 853. Therefore to some extent anyway the American assets fulfilled the third condition, and some estate tax was leviable upon his death.

How much of local assets should be regarded as subject to distribution as part of Sanchez's estate has been impliedly answered already. On the one hand his executor, or the liquidating representative, would not be allowed to circumvent the tax by allocating Cuban assets to the liquidating dividend; on the other the Commissioner, who had no jurisdiction whatever over the liquidation, had no power to allocate the American assets to the decedent's estate. In such a dilemma the only escape is by allocating all assets to the dividend pari passu. That would result in imposing a tax upon the devolution of that proportion of the liquidating dividend which the gross American assets bore to all the gross assets. In the accounting from which the dividend emerges, obviously the debts must figure without the limitation imposed by section 403 (b) (1), Revenue Act 1918, 40 Stat. 1098, and Sanchez's estate would therefore get an unauthorized benefit, if the assets had been in fact his. As we view it they were not, and although his creditors could treat them as such, he was nevertheless only a surety; the "sociedad" was the principal debtor. On the other hand in figuring the proportion of the dividend which the American assets represent, they are to be taken at their gross value without deduction for debts, even those debts for which they may have been pledged. We refer to our discussion of the analogous situation in City Trust Co. v. Bowers (C. C. A.) 68 F.(2d) 909, 913; the pledgor is to be regarded as the owner of the pledge and a debtor for the whole loan. Again, any shares or bonds in foreign corporations will be counted as American assets if the documents were in this country. The Commissioner ruled otherwise, acting presumably in reliance upon Blodgett v. Silberman, 277 U. S. 1, 48 S. Ct. 410, 72 L. Ed. 749, but Burnet v. Brooks, supra, 288 U. S. 378, 53 S. Ct. 457, 77 L. Ed. 844, 86 A. L. R. 747, has changed the law as to aliens in this respect. The fact that in assessing the tax by a wrong method the Commissioner made this concession does not conclude us from assessing it correctly by another method.

As we fix the tax upon Sanchez's liquidating dividend in the accounting and not upon the American assets as such, it may perhaps be supported upon quite another theory, not argued, which we only suggest lest it be thought that by silence we have overlooked it. We do not find it necessary to pass upon its validity. In Burnet v. Brooks, supra, 288 U. S. 378, 53 S. Ct. 457, 77 L. Ed. 844, 86 A. L. R. 747, only two kinds of shares and bonds were in question, those of American corporations and those of foreign corporations when the documents were here; the tax was sustained as to both. We understand that the ratio decidendi of Farmers' Loan & Trust Co. v. Minnesota, 280 U. S. 204, 50 S. Ct. 98, 74 L. Ed. 371, 65 A. L. R. 1000, and the cases which followed it, applies only between states, and that the United States has, though the states have not, power to levy a death duty on an alien obligee, when it can reach the obligor, because he is within its borders. It may be that a foreign corporation by its activities can also so subject itself to the power of Congress as to be "present" as obligor, for the purpose of taxing the devolutions of its shares or debts, just as it may make itself "present" for personal judgment. In that event the question here would be how continuously and substantially Sanchez carried on the "business" of the "sociedad de gananciales" in New York. If his activities were enough, his individual estate could be made liable for the devolution of some part at any rate of his dividend in liquidation, which is all we are holding it for anyway.

The judgment must be reversed and a new trial ordered in accordance with the foregoing. We understand that the plaintiff does

not complain of the judge's ruling as to the life insurance policy.

Judgment reversed.